(57 South. 371.)

Nos. 18,775, 18,927.

GATES v. OTIS.

(Jan. 15, 1912. Rehearing Denied Feb. 12, 1912.)

*(Syllabus by the Court.)*

ATTACHMENT (§ 25*)—BILLS AND NOTES (§ 129*)—NONRESIDENCE—ACTION ON NOTE.

Defendant's domicile in the state of Louisiana was not changed by his temporary residence for business purposes in the state of Texas; and the attachment sued out against the defendant as a nonresident was properly dissolved. The balance due on the notes in suit, after the sale and credit of the collateral, became exigible, under the terms of the contract, at the option of the plaintiff, on the failure of the defendant to furnish further security as stipulated in the contract.

Evidence fails to sustain the defense of want and failure of consideration.

[Ed. Note.—For other cases, see Attachment, Cent. Dig. §§ 61–72; Dec. Dig. § 25;* Bills and Notes, Dec. Dig. § 129.*]

Appeal from Fifteenth Judicial District Court, Parish of Calcasieu; Winston Overton, Judge.

Action by John W. Gates against C. D. Otis. Judgment dissolving writ, and plaintiff appeals. Judgment on the merits for plaintiff, and defendant appeals. Affirmed on both appeals.

J. W. Williams and McCoy, Moss & Knox, for plaintiff. Robert R. Stone, for defendant.

LAND, J. On December 22, 1910, the plaintiff sued the defendant as a nonresident of the state of Louisiana, and caused a writ of attachment to issue, under which two local banks were garnished.

Defendant moved to dissolve the attachment, with damages, on the ground that he was a resident and citizen of Lake Charles, Calcasieu parish, La.; and that the affidavit that the respondent was a nonresident was false and untrue to the knowledge of the plaintiff. The motion was tried, and judgment was rendered dissolving the writ of attachment, at the cost of the plaintiff, who thereupon appealed.

Prior to January, 1910, the defendant, with his family, had resided for a number of years in the city of Lake Charles, La., where he conducted a nursery business in the name of his wife. In December, 1909, negotiations began between the plaintiff, a well-known capitalist, and the defendant, looking to the establishment of a large nursery enterprise near Port Arthur, Tex. These negotiations culminated in the formation, in April, 1910, of a Texas corporation, the Port Arthur Nursery Company, capitalized at $40,000, represented by 400 shares of the par value of $100 each. In the meantime, under a verbal understanding with the plaintiff, the defendant proceeded to Port Arthur and went to work as general manager at a salary of $150 per month. On the organization of the company, defendant received 180 shares of stock, which was paid in by the plaintiff, who took the nine notes of the defendant for $2,000 each, dated December 31, 1909, maturing in five years, and bearing 6 per cent. per annum interest from date. These notes were secured by a pledge of the 180 shares of stock issued to the defendant. Defendant was employed by the company as general manager for the year 1910, and his duties as such required him to live nearly all the time on the premises of the nursery company near Port Arthur. Defendant's family remained during the year at his usual place of residence in Lake Charles. On December 21, 1910, the defendant sold out his stock in the corporation, and dissolved his connection with the company. On the next morning, his property was attached in Lake Charles. It is true that in December, 1909, and through most of the year 1910, the defendant manifested an intention of becoming a resident of the state of Texas; but this intention was never carried into effect, and was abandoned before the institution

of this suit. On September 29, 1910, the defendant wired the plaintiff that the situation was unbearable, and requested him to purchase his shares of stock. Later the defendant agreed to sell at $90 per share, and the sale was made, and the proceeds were credited on the notes sued on as of date December 21, 1910. Defendant lived on the premises of the nursery company, because he was the manager of that corporation, and his continued sojourn there was dependent on the tenure of his employment. Had the enterprise proved successful, and the defendant had been retained as general manager, he in all probability would have fixed his permanent residence in the state of Texas. Defendant, as it was, maintained his home in the city of Lake Charles during the year 1910, and did not dispose of his business or property in the state of Louisiana. He also paid his poll taxes for the years 1909 and 1910 as a resident of the parish of Calcasieu.

Defendant's residence in Texas was temporary and uncertain in its nature, and lacked the animus manendi necessary to constitute a domicile or habitual residence. C. C. 38. The Code makes a distinction between residence and domicile; the latter being called "principal establishment," or "habitual residence." One may have several residences, but can have only one domicile. The Code of Practice provides that a defendant must be sued in the parish of his domicile.

On December 21, 1910, the defendant sold his stock in the nursery company and resigned his office as general manager. He thereupon ceased to have even a *business* residence in the state of Texas. The attachment was sued out the next day.

We are of opinion that the writ of attachment was properly dissolved.

Defendant excepted to the action as premature, and demurred to the petition. The exceptions were referred to and tried with the merits. The defendant then answered, admitting his signature to the notes, but pleading want of consideration. For further answer, the defendant averred that the plaintiff contributed the whole capital stock of the Port Arthur Nursery Company, and had certificates issued to dummy stockholders, in violation of the laws of the state of Texas; that defendant subscribed to 180 shares of the capital stock of said corporation, under an agreement with plaintiff, as agent and promoter, that the payment of said notes would not be exacted from defendant, but that the profits of the concern should be applied to the liquidation thereof; that plaintiff fraudulently turned over to said corporation real property at a fictitious and exorbitant valuation, in lieu of cash, and then loaned the corporation $60,000 to erect its buildings, thereby evading the laws of the state of Texas; that, as alleged part payment of the capital stock, the plaintiff charged said nursery company with $600, paid to one of his personal employés whom he had discharged; that said corporation was never legally organized, and therefore the notes given in payment of stock subscriptions to plaintiff, as agent and promoter, are illegal, null and void, and uncollectible for want of consideration; that, should the court hold that said notes were given to the plaintiff personally, then, in the alternative, the defendant pleads want and failure of consideration, for the reason that plaintiff promised, if defendant would assist him in starting the nursery company and subscribe for stock in same, he would employ him as manager for five years at a salary of $1,800 per annum; that plaintiff would buy the defendant's nursery stock in Lake Charles, La., and Winnie, Tex., valued at $2,500, for the use of said nursery company, and that the plaintiff would carry defendant's stock in said corporation until the same should be paid out of the profits of the concern; that

defendant was induced by said promises of the plaintiff to subscribe to the stock of the nursery company and to give the notes sued on; that when said company was organized the defendant was given only one year's employment at the salary fixed, his nursery plants were not purchased, and he became manager only in name; that in the summer of 1910, during the absence of plaintiff in Europe, the defendant was forced to pay, under protest, $540 interest on said notes, despite his aforesaid agreement with the plaintiff; that plaintiff and his private secretary ran the nursery to suit themselves, loaning money to said corporation to build costly improvements, unnecessary and ruinous to the small capitalization of the nursery company, without authority from its stockholders or directors, thereby creating a debt of $60,000; that defendant gladly joined with the other alleged stockholders in agreeing to sell their stock for the purpose of liquidating the corporation, and transferring it to other hands; that defendant made no complaint against the failure to keep the promises made to him when he subscribed to the stock of the nursery company—plaintiff having assured him that he would stand the loss personally due to this method of liquidating the corporation. Defendant, in the alternative, pleaded set-offs in the amount of $540, paid as interest under protest, and reconvened for $5,000, as damages for the illegal attachment of his property. Plaintiff pleaded estoppel against defendant's attack on the organization or the acts of the corporation, known as the Port Arthur Nursery Company, in its purchase of land or other property, or its conduct with its employés, for the reason that the defendant was a stockholder and director of said corporation, and acquiesced in all of its acts which he is now seeking to attack.

The case was tried, and there was judgment for plaintiff for $2,310, with 5 per cent. per annum interest from December 21, 1910, until paid, and dismissing the reconventional demand of the defendant as in case of nonsuit. Defendant has appealed.

Each of the notes sued on set forth a pledge of 20 shares of the capital stock of the Port Arthur Nursery Company, with authority to the holder to sell the same on the nonperformance of the promise evidenced by the instrument; that is, on or before five years after date, to pay the plaintiff or order $2,000 at Port Arthur, Tex., with interest at the rate of 6 per cent. per annum, interest payable semiannually, until paid. The instrument contained the following stipulation:

"And that if in the opinion of the holder hereof the value of the said collateral should at any time be less than two thousand dollars, the undersigned shall on demand furnish such further security as will be satisfactory to the holder hereof, and in case of failure so to do, this note thereupon at the option of the holder thereof shall become due and payable forthwith, and the whole or any part or parts of said securities, or substitutes or additions may be sold as herein provided at the option of the holder thereof."

The petition alleges, and the documents annexed show, that on December 21, 1910, the defendant sold the collateral for $16,200, which amount was credited on the notes sued on. The petition further alleges a demand on the defendant to furnish further security for the balance of the indebtedness, and the failure and refusal of the defendant to do so; and that thereupon the plaintiff exercised the option of declaring said notes to be due and payable.

The five-year term of payment was conditioned on the continued existence of collateral security, in the hands of the holder, in value not less than the principal of each note. As the whole includes all of its parts, any unpaid balance due on each note was subject to all the stipulations and conditions of the contract, which was, in effect, no security, no time. Before the sale of the col-

lateral, it had depreciated at least 10 per cent. in value, and this depreciation gave the holder of the notes the right to call for additional security. We cannot conceive how this right was affected by the voluntary sale of the collateral by the defendant. The crediting of the proceeds of the sale on the notes operated merely as a partial payment.

The consideration of the notes sued on was the sum of $18,000 paid in money or property by the plaintiff for the 180 shares of stock issued to the defendant.

Whatever may have been the negotiations between the plaintiff and the defendant, they were merged in the subsequent written contracts between the parties, to wit, the notes, the stock subscription list, the charter, and the contract of employment. All the parol agreements and promises pleaded by the defendant were denied under oath by the plaintiff, and have not been proven by a preponderance of the evidence.

The testimony of the defendant is clearly insufficient to rebut the presumption arising from his own written contracts, and to overcome the adverse testimony of the plaintiff.

Defendant's averment that the other stockholders were mere dummies is disproved by the evidence. All of them lost $10 per share, and all except one, in settling their notes held by the plaintiff, paid the difference in money. Plaintiff testified that he disposed of all the stock acquired from defendant at $62.50 per share, at a loss of $27.50 per share. The enterprise under the management of the defendant proved a financial failure. There was a loss of more than $10,000 in the operation of the nursery proper. While the capital stock was fixed at $40,000, it was understood that the plaintiff would advance $60,000 for permanent improvements. This sum was advanced during the year 1910, and was expended in the erection of buildings, greenhouses, and other betterments. These improvements were considered to be worth as much as they cost, and were not treated as a factor in the stock liquidation that took place on December 21, 1910, at 90 cents on the dollar of par value.

On the organization of the nursery company, the plaintiff transferred to the corporation real estate valued at $21,600; and the preponderance of the evidence shows that the valuation was not grossly excessive, as charged in defendant's answer. The same may be said of the purchase of a warehouse by the corporation. The averment that the plaintiff charged to the corporation the sum of $600, paid to one Cobb for a personal debt of the plaintiff, is not sustained by a preponderance of the evidence. The plaintiff testified that he, as president, employed Cobb to work exclusively on the nursery grounds; and that Cobb was subsequently discharged by the defendant, its general manager. Cobb then sued plaintiff individually for damages, and the suit was charged to the company. Plaintiff afterwards refunded $300 of the amount so charged. After a careful review of the evidence, we conclude that the defendant has failed to establish, by a preponderance of the evidence, any of the defenses set up in the answer.

The evidence shows that on December 21, 1910, the defendant failed and refused to furnish further security for the balance due on the notes in controversy, and declined to accept plaintiff's compromise offer to cancel the notes on the payment of 50 per cent. of the balance due thereon.

It is therefore ordered that the judgment dissolving the attachment be affirmed, at the cost of the plaintiff and appellant.

It is further ordered that the judgment on the merits be affirmed, at the cost of the defendant and appellant.